UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

FAROD K. WESTERFIELD,

     Petitioner,     Case No. 1:08-cv-610

v.              Honorable Robert Holmes Bell

CARMEN PALMER,

     Respondent.

_____/

## REPORT AND RECOMMENDATION

    This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C. § 2254. Petitioner is serving a prison term of 14 to 70 years, imposed by the Kent County Circuit Court on September 28, 2006, after Petitioner pleaded guilty to first-degree criminal sexual conduct (CSC I), MICH. COMP. LAWS § 750.520b(1)(e). In his *pro se* petition, Petitioner raises two grounds for relief, as follows:

  I.  THE TRIAL COURT ERRED IN REFUSING TO RULE ON AND GRANT DEFENDANT'S MOTION TO QUASH THE INFORMATION BASED ON LACK OF PROBABLE CAUSE THAT DEFENDANT COMMITTED THE OFFENSE. THIS ERROR VIOLATED DEFENDANT'S DUE PROCESS RIGHTS.

  2.  THE TRIAL COURT ERRED AND VIOLATED DEFENDANT'S DUE PROCESS RIGHTS IN DENYING DEFENDANT'S MOTION TO WITHDRAW HIS PLEA OF GUILTY, WHICH WAS TENDERED DESPITE HIS INNOCENCE AND WHICH WAS THE PRODUCT OF THE PRESSURE BROUGHT TO BEAR AGAINST HIM BY HIS TRIAL ATTORNEY.

Respondent has filed an answer to the petition (docket #7) stating that the grounds should be denied because they are noncognizable state law claims which have no merit. Upon review and applying the AEDPA standards, I find that Petitioner's claims are either noncognizable or without merit. Accordingly, I recommend that the petition be denied.

## Procedural History

### A.    Trial Court Proceedings

The state prosecution arose from the August 26, 2001 armed robbery and rape of Glenda Harris in her home at 1150 Sigsbee, Grand Rapids, Michigan. Petitioner was charged with one count of armed robbery and one count of CSC I. Following a preliminary examination on December 15 and 20, 2004, he was bound over on both charges. A supplemental information was filed charging Petitioner as a habitual offender, second offense.

Petitioner pleaded guilty on July 25, 2006 to the CSC I charge in exchange for the dismissal of both the armed robbery charge and the supplemental enhancement charge. In addition, the prosecutor agreed not to file an additional charge of first-degree home invasion, which would have resulted in a consecutive sentence. Further, the parties stipulated and the trial court accepted the stipulation to sentence Petitioner within the minimum sentence guidelines range of 108 to 180 months imprisonment.

According to the testimony introduced at the preliminary examination on December 15, 2004, Glenda Harris had celebrated her birthday at a surprise party thrown by her children. (Prelim. Exam. Tr., Vol. I (PE Tr. I), 7, docket #16.) She received about $1,200.00 or $1,300.00 in birthday gifts, which she left with someone at the party. (*Id.* at 31-32.) Harris fell asleep on the couch sometime before dark and woke later in the night. (*Id.* at 6-7.) Harris testified that, when she

fell asleep, all of her lights were on, as was the television. When she awoke, the entire apartment was in darkness. Harris thought that the circuit breaker had blown, and she went toward the door to go to the upstairs apartment to ask her brother to turn the circuit breakers on. (*Id.*) As she approached the door, a man came from behind her, pulled an arm behind her, held a knife to her throat, and stated, "[B]itch, don't touch that do' [sic] knob." She did not recognized the man's voice. The man demanded, "[B]itch, where's that birthday money?" When she did not tell him, he started beating her in the face, threw her on the couch and tried to smother her with a pillow. (*Id.* at 9.) Every time she wiggled free of the pillow, he would strike her in the face. (*Id.* at 10.) The man kept demanding the birthday money. (*Id.* at 10.) Harris finally told the man that her brother had the money upstairs. (*Id.* at 11.) She was allowed to get to the front door before the man twirled her around, took her back to the couch and began to beat her again. The man then said, "[B]itch, take all your clothes off." (*Id.* at 11.) She begged him not to kill her and took her clothes off. As they approached the couch, she said, "Oh, I forgot I got some money in my purse." She retrieved about $220.00 from the wallet in her purse and gave it to him, leaving approximately $1,300.00 of the $1,500.00 social security payment she had received for herself and her son. (*Id.* at 11-12, 23.) The purse had been behind Harris as she was sleeping. (*Id.* at 12.) After the man took the money, he raped her, putting first his finger and then his penis inside her vagina. (*Id.* at 13.) After he ejaculated, the man threw a piece of cloth to her, which she assumed was her clothing as that was the only thing on the floor. The man stated, "[B]itch, wipe yourself." (*Id.* at 13.) She did. (*Id.* at 14.) The man then led Harris to the bedroom, saying, "I'ma [sic] take you in this bedroom, bitch, and I'ma [sic] kill you." (*Id.* at 15.) She begged him not to kill her because she had a handicapped child. When the man loosened his grasp, Harris ran to the front door and opened it. Her niece was

sitting on the front step, and Harris told her to let her use the phone because she had been raped. (*Id.* at 15.) When Harris ran out of her apartment, she was naked. (*Id.* at 16.) The man ran out of the back door, and Harris heard him go over the fence. (*Id.*) According to Harris, she had black eyes and bruising from the assault. Harris was unable to identify the man because she never saw what he looked like, since her house was in complete darkness. (*Id.* at 15.)

Grand Rapids Police Detective Karl Holzheuter testified that he transported to the State Police Crime Lab a sheet, blanket, red t-shirt and sweatpants that were collected at the scene, together with a CSC kit. (*Id.* at 37.) The court admitted the Michigan State Department of State Police laboratory report under MICH. COMP. LAWS § 600.2167. (*Id.* at 41.) Holzheuter laid the foundation for introduction of information associated with Petitioner's prisoner number, which included DNA information. Petitioner's DNA information matched the DNA information taken from the Harris clothing. When an association is found within the database, state policy requires the taking of a new sample from the suspect for comparison with the crime evidence. (*Id.* at 41, 44.) A new sample was taken from Petitioner. The results from testing on that sample were not yet returned. (*Id.* at 45.)

In light of the fact that Holzheuter could not say with clarity what level of similarity was involved in an "association," the court adjourned the preliminary examination until the prosecution could provide additional testimony from lab personnel to establish the identification of the perpetrator and further evidence concerning the chain of custody on the clothing evidence recovered from the crime scene. (*Id.* at 48.)

The preliminary examination continued on December 20, 2004. (PE Tr. II, docket #17.) Grand Rapid Police Crime Scene Technician Dean Garrison identified the property receipt he

completed for the evidence he seized at 1150 Sigsbee on August 26, 2001. That evidence consisted

of a sheet, a blanket, a shirt and some sweat pants. (PE Tr. II, 4-5.) The sheet and blanket were

found on the sofa. (PE Tr. II, 5-6.) The shirt and sweat pants were found in a garbage bag in the

northwest corner of the living room. (*Id.* at 6.) The t-shirt was red and had a logo of the East Coast

Invasion. (*Id.* at 6-7.) Garrison delivered the items to the Property Management Unit of the Grand

Rapids Police. (*Id.* at 5.)

Detective Thomas Vander Ploeg identified the photocopy of the property receipt lab

request completed by Garrison and given to Vander Ploeg and included in the case file. (PE Tr. II,

8-9.) On August 28, 2004, Vander Ploeg removed the evidence from the evidence locker and

completed a lab request form for the Michigan State Police. He then provided both the form and the

items to Detective Holzheuter for transport to the lab. (*Id.*)

Joel Schultze testified as the supervisor of the Michigan State Police Crime Lab DNA

Unit in Grand Rapids. Schultze identified a lab report he had authored and the attachments to that

report. The report, dated June 22, 2004, stated that the DNA testing had been outsourced to an

external DNA laboratory for testing and that the results had come back with a DNA profile. The

profile was taken from a sperm fraction from a stain on Harris' sheet and was entered into the

combined DNA indexing system (CODIS). Attached to Schultze report was the DNA report from

Orchid Cellmark, together with a CODIS report finding a match between the profile identified by

Orchid Cellmark and the CODIS profile linked to Petitioner's MDOC identification number. (PE

Tr. II, 12-13.) Schultze entered the Orchid Cellmark profile into the CODIS system and authored

the CODIS report. (*Id.* at 14.) According to Schultze, the 13 low site DNA profile markers from

the sperm sample matched those in the database for Petitioner. Thereafter, as a matter of procedure,

the CODIS laboratory in Lansing would obtain a new DNA sample from Petitioner, reanalyze it at the Grand Rapids Laboratory, and determine if it again matches the Orchid Cellmark profile. The laboratory would then issue a report, including information about statistical certainty. (*Id.*) Schultz testified that a sperm sample taken from the sweat pants also was submitted and matched Petitioner's profile. (*Id.* at 16.) According to Schultze, the female DNA (epithelial cell fraction) could be separate from the male DNA (sperm cell fraction). (*Id.* at 17.) In examining the epithelial cell fractions, the laboratory found two different female donors. (*Id.* at 17-18.)

On the basis of the testimony introduced at both preliminary examination hearings, the court found probable cause to find both that the offense occurred and that Petitioner was the perpetrator. Petitioner was bound over on both CSC I and armed robbery. (PE Tr. II, 22-23.)

On January 14, 2005, Petitioner, through his first attorney, sought and obtained authorization to employ an investigator. (Mot. for Relief Tr., 3-4, docket #18.) On March 25, 2005, the court heard defense counsel's motion to withdraw from both the instant case and another case against Petitioner involving a charge of assault on a police officer. Counsel cited the basis of the motion as a breakdown in the attorney-client relationship and his client's insistence upon a different attorney. (First Mot. to Withdraw Tr., 3, docket #19.) Counsel reported that he had not yet received the DNA testing results. He also reported that the authorized investigator was still diligently working on the case. (*Id.* at 5-6.) The court granted the motion to withdraw and indicated that the investigator could continue working, and should report to new counsel. (*Id.* at 6.)

On June 10, 2005, stand-in defense counsel argued a motion for discovery of data required by defense counsel's retained DNA expert, Dr. Kessis. (Mot. re: Discovery Tr., 3-4, docket #20.) At that time, trial had been reset for July 11, 2005. (*Id.* at 4.) The court ordered the expert

and defense attorney to confer about what requested information the expert had recently obtained in another case, so as to eliminate duplication. It further ordered that the expert needed to document why he needed evidence involving other people's DNA. The court finally indicated that the expert would be provided the information he needed for purposes of making an informed judgment about whether the state crime lab properly followed protocols and conducted appropriate testing and statistical calculation. (*Id.* at 11-12.) The court indicated its willingness to hold an evidentiary hearing, if necessary, and the hearing was adjourned until the parties had an opportunity to further define their disagreements or resolve the matter. (*Id.* at 13-14.)

On June 24, 2005, the court heard argument on defense counsel's motion to reduce bond. (First Mot. to Reduce Bond, docket #21.) In addition, Petitioner had filed a *pro per* motion under Michigan's 180-day rule, for which a personal recognizance bond is required if a defendant has been held longer than 180 days. Defense counsel stated in her motion to reduce bond that Petitioner had been incarcerated for more than 180 days, but she did not believe that the speedy trial rule applied because Petitioner was on parole and would not be subject to release even if bond were granted. (*Id.* at 3.) Counsel indicated that a polygraph was scheduled for July 28, 2005. (*Id.* at 4.) She advised the court that she intended to postpone resolution of the expert discovery matters until the polygraph results were back. (*Id.* at 4-5.) The court concluded that releasing Petitioner on bond in the instant case would simply result in Petitioner being sent from the county jail to an MDOC facility on his parole violation. (*Id.* at 5.)

On July 22, 2005, a hearing was held on defense counsel's second motion to reduce bond. (Second Mot. to Reduce Bond, docket #22.) At that time, defense counsel represented that, after the hearing on the first motion, she was advised that Petitioner was no longer on parole, having

reached his maximum time on the underlying case for which he was on parole. (*Id.* at 3.) The prosecutor contended that Petitioner had not been jailed for more than 180 days once delays attributable to Petitioner were excluded. (*Id.* at 5.) The motion was continued for verification of Petitioner's status. (*Id.* at 6.) In addition, the prosecutor represented on the record that the parties had stipulated to an evidentiary hearing regarding the discovery required by the defense expert. (*Id.* at 7.)

Thereafter, an evidentiary hearing was scheduled for August 22, but was subsequently cancelled. (Cir. Ct. Docket Sheet at 5, docket #15.) Trial was adjourned repeatedly from April 11, 2005 to July 11, 2005, to September 12, 2005, to October 24, 2005, to January 3, 2006, and to January 11, 2006. (*Id.* at 4-6.)

On January 11, 2006, defense counsel moved to adjourn so that she could have some independent testing performed on the vaginal swabs that were tested in February 2005. The report from the February testing was received by her office in early December, but was inadvertently misfiled in another one of Petitioner's cases. Counsel represented that, having now reviewed that independent analysis, she believed an independent analysis of all DNA samples was necessary. (Mot. to Adjourn, 3-4, docket #23.) She requested adjournment and funding for the independent testing. (*Id.* at 4.) In light of the seriousness of the charges and Petitioner's strenuous claim of innocence, the court granted both motions. (*Id.* at 6.)

On March 23, 2006, defense counsel moved to withdraw from the case at her client's request. (Cir. Ct. Docket Sheet at 7.) The motion was heard on April 18, 2006. (Second Mot. to Withdraw Tr., docket #24.) The court noted that the prosecution's DNA report had come in and the process of independent DNA testing was not yet concluded. (*Id.* at 3.) Counsel represented that

Petitioner remained committed to the idea of having a new attorney appointed and she indicated that she believed that there had been a breakdown in communication. (*Id.* at 4.) The court advised Petitioner that, ordinarily, changes in appointed counsel were not granted without good cause. (*Id.* at 5.) Petitioner stated that he harbored doubts about counsel's effectiveness, citing a delay in the trial date on January 11, 2006 because of his attorney's misfiling of the DNA report. He also stated that an irreparable breakdown in the relationship had developed. (*Id.* at 7, 9.) The court advised Petitioner that appointment of new counsel would further delay trial and asked Petitioner whether, having already had two attorneys, he believed he would be ready to go to trial if his motion were granted. (*Id.* at 8, 10-11.) Receiving an affirmative answer, the court granted the motion, requesting that a very seasoned criminal defense attorney be appointed, and adjourned the case until July 24, 2006. (*Id.* at 11.)

At the time set for trial, July 24, 2006, there was a one-day delay in the proceedings so that defense counsel could evaluate some new evidence. (Plea Tr., 6-7, docket #25.) On July 25, 2006, defense counsel requested an adjournment on the basis of DNA evidence received late the preceding week. (*Id.* at 1.) The prosecutor opposed the adjournment. She reported that the new DNA evidence confirmed that Petitioner's DNA was found in the victim's vagina, as well as on her sheet and clothing. (*Id.* at 2-3.) In addition, the prosecutor advised that she had been informed that defense counsel did not intend to call Dr. Kessis, the DNA expert, because he essentially agreed with the work done by the prosecutor's DNA lab. (*Id.* at 5.) The court, considering the length of delay in the case and the fact that the new evidence did no more than reinforce the prior evidence, ruled that the case would begin on Monday of the next week. (*Id.* at 7.) The parties then placed on the record a plea offer that had been made to Petitioner. The prosecution offered that, if Petitioner

pleaded guilty to CSC I, the prosecution would dismiss the armed robbery charge and the second habitual offender supplement and would refrain from charging first-degree home invasion, which posed a potential consecutive sentence. In addition, the prosecutor agreed to the minimum sentencing guideline range of 108 to 180 months, and indicated that the victim agreed with that range. (*Id.* at 7-9.)

Defense counsel stated that he had discussed the offer with his client the day before. Counsel told Petitioner that, as he scored the guidelines, the minimum sentencing range would likely be substantially higher – 171 to 285 months, and with the supplement, up to 356 months. (Plea Tr., 12-13.) The court asked Petitioner if he understood the offer, and Petitioner stated that he did. (*Id.* at 14.) After a brief recess to discuss the matter with his attorney, Petitioner agreed to accept the plea offer. (*Id.* at 14.)

The trial court then conducted a lengthy and thorough plea colloquy, during which the plea offer was repeated. (Plea Tr. 15-22.) The court indicated that it would follow the prosecutor's recommendation of a minimum sentence between 108 and 180 months. (*Id.* at 19.) Defendant then admitted that he had sexually assaulted and penetrated Glenda Harris and had threatened her with a knife. (*Id.* at 21.) The court accepted the plea, finding it to be "freely, voluntarily, knowingly and intelligently proffered." (*Id.* at 22.)

On September 5, 2006, the day set for sentencing, defense counsel stated that he had no objections to the presentence report, noting that the recommendation was that Petitioner's minimum sentence be 108 to 180 months in accordance with the plea agreement, notwithstanding the fact that the scoring of the guidelines would have resulted in a minimum sentence of 225 to 375 months. Counsel then addressed the court about two *pro per* motions that had been filed by

Petitioner without informing counsel. The first, a motion to quash the information, had previously been researched by defense counsel, who concluded the motion lacked merit and could not be brought in good faith. (S. Tr. I, 4, docket #26.) The court had returned the motion to Petitioner without decision because Petitioner was represented by counsel and had no right to simultaneously file a motion *in pro per*. (*Id.* at 5.) The court advised Petitioner that he could take the matter up with his appellate attorney or he could seek to represent himself, but not both. The court also noted that Petitioner's guilty plea had waived any defect in the preliminary proceedings. (*Id.* at 5, 7.)

Petitioner then sought to withdraw his plea, arguing that he had been pressured into taking the plea. (S. Tr. I, 7.) After a brief discussion between Petitioner and counsel, counsel moved for a one-week adjournment so that counsel could meet with Petitioner at the jail with the entire case file and research, much of which he had not brought to court. (*Id.* at 8.) The court granted the adjournment, but carefully advised Petitioner that the agreement under which he had pleaded guilty was extraordinarily generous and that the substantial DNA evidence would be extremely hard for a defendant to overcome. (*Id.* at 10-12.)

The second date for sentencing, September 12, 2006, was again adjourned so that the defense could follow up some new developments. (S. Tr. II, 5, docket #27.) On September 28, 2006, the third date for sentencing, defense counsel moved to withdraw the plea after placing on the record the consequences of success on that motion. (S. Tr. III, 4, docket #28.) Petitioner argued that he would not have pleaded guilty if not pressured by his attorney, who Petitioner believed had not represented his best interests. (*Id.* at 6.) The court responded that the lenient plea agreement reflected an almost extraordinarily capable effort by counsel. (*Id.* at 7.) The court denied the motion

as frivolous. (*Id.* at 5-6.) The court sentenced Petitioner within the guidelines of the plea agreement to a prison term of 14 to 70 years.

## B. Direct Appeal

Petitioner appealed as of right to the Michigan Court of Appeals. His brief, which was filed by counsel on January 12, 2007, raised the same two issues as raised in this application for habeas corpus relief. (See Def.-Appellant's Br. on Appeal, docket #29.) By unpublished order issued on March 5, 2007, the Michigan Court of Appeals rejected all appellate arguments and affirmed Petitioner's conviction and sentence. (See 3/5/07 Mich. Ct. App. Order (MCOA Ord.), docket #29.)

Petitioner filed a *pro per* application for leave to appeal to the Michigan Supreme Court. Petitioner raised the same two claims raised before and rejected by the Michigan Court of Appeals. By order entered July 30, 2007, the Michigan Supreme Court denied his application for leave to appeal because it was not persuaded that the questions presented should be reviewed. (See Mich. Ord., docket #30.)

## Standard of Review

This action is governed by the Antiterrorism and Effective Death Penalty Act, PUB. L. 104-132, 110 STAT. 1214 (AEDPA). *See Penry v. Johnson*, 532 U.S. 782, 792 (2001). The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693-94 (2002). The AEDPA has "drastically changed" the nature of habeas review. *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001). An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant

to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d).

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d). This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey*, 271 F.3d at 655. In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts. *Bailey*, 271 F.3d at 655; *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000). The inquiry is "limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time [the petitioner's] conviction became final." *Onifer v. Tyszkiewicz*, 255 F.3d 313, 318 (6th Cir. 2001).

A decision of the state court may only be overturned if (1) it applies a rule that contradicts the governing law set forth by the Supreme Court, (2) it confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a different result; (3) it identifies the correct governing legal rule from the Supreme Court precedent but unreasonably applies it to the facts of the case; or (4) it either unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend a principle to a context where it should apply. *Bailey*, 271 F.3d at 655 (citing *Williams*, 529 U.S. at 413); *see also Bell*, 535 U.S. at 694; *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003).

A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411; *accord Bell*, 535 U.S. at 699. Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable." *Williams*, 529 U.S. at 410.

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Lancaster*, 324 F.3d at 429; *Bailey*, 271 F.3d at 656. This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989). Applying the foregoing standards under the AEDPA, I find that Petitioner is not entitled to relief.

### Discussion

Petitioner raises two grounds for habeas relief. First, he contends that he was deprived of his Sixth Amendment right to aid in his own defense and his Fourteenth Amendment right to due process when the trial court refused to rule on his *pro per* motion to quash the information. Second, he argues that the trial court violated his right to due process when it denied his motion to withdraw his guilty plea.

I.    Motion to Quash

In his first ground for habeas relief, Petitioner contends that the criminal information should have been quashed and the charges against him should have been dismissed because the

information was based on insufficiently verified DNA evidence.  Petitioner also argues that the trial court violated his Sixth Amendment right to be heard on his *pro per* motion, even though he was represented by counsel.

Petitioner's argument is meritless for several reasons.  First, as the trial court recognized (*see* S. Tr. I, 5-7, docket #26), courts long have held that a valid guilty plea bars habeas review of most non-jurisdictional claims alleging antecedent violations of constitutional rights.  *See Tollett v. Henderson*, 411 U.S. 258, 267 (1973).  Among claims not barred are those that challenge "the very power of the State to bring the defendant into court to answer the charge against him," *Blackledge v. Perry*, 417 U.S. 21, 30 (1974), and those that challenge the validity of the guilty plea itself.  *See Hill v. Lockhart*, 474 U.S. 52, 58 (1985);  *Haring v. Prosise*, 462 U.S. 306, 320 (1983);  *Tollett*, 411 U.S. at 267.  A plea not voluntarily and intelligently made has been obtained in violation of due process and is void.  *See McCarthy v. United States*, 394 U.S. 459, 466 (1969).  Petitioner's claim does not challenge the power of the state to bring him into court.  Thus, the only means available for challenging his conviction is to claim that his plea is invalid, i.e., it was not knowingly and voluntarily entered into.  *See Mabry v. Johnson*, 467 U.S. 504, 508 (1984) ("It is well-settled that a voluntary and intelligent plea of guilty made by an accused person, who has been advised by competent counsel, may not be collaterally attacked.").  Petitioner challenges the voluntariness of his plea in his second ground for habeas relief.  Petitioner's first habeas ground therefore provides no independent basis for relief, as it was waived by his guilty plea.  The trial court's determination clearly constituted a reasonable application of established Supreme Court precedent.

Second, Petitioner was represented by counsel and at no time sought to represent himself. While the Sixth and Fourteenth Amendments guarantee criminal defendants the right to self-representation at trial, *see Faretta v. California*, 422 U.S. 806, 833-34 (1975), the request to proceed without counsel must be asserted unequivocally and in a timely fashion. *United States v. Martin*, 25 F.3d 293, 295-96 (6th Cir. 1994). Petitioner made no request for self-representation at all, much less an unequivocal one. Further, as the trial court noted (*see* S. Tr. I, 5, docket #26), the Supreme Court never has held that a defendant had a constitutional right to "hybrid representation," wherein a defendant had a right to participate in his own defense along with counsel. *United States v. Green*, 388 F.3d 918, 922 (6th Cir. 2004) (citing *Wilson v. Hurt*, 29 F. App'x 324, 327-28 (6th Cir. 2002)). As a consequence, the trial court reasonably applied established Supreme Court precedent in rejecting the motion.

Finally, Petitioner's claim that the information was defective or inadequate fails to raise a constitutional claim. Petitioner bases his argument entirely on Michigan law. The court may entertain an application for habeas relief on behalf of a person in custody pursuant to the judgment of a State court in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a). A habeas petition must "state facts that point to a 'real possibility of constitutional error.'" *Blackledge v. Allison*, 431 U.S. 63, 75 n.7 (1977) (quoting Advisory Committee Notes on Rule 4, RULES GOVERNING HABEAS CORPUS CASES). The federal courts have no power to intervene on the basis of a perceived error of state law. *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *Pulley v. Harris*, 465 U.S. 37, 41 (1984). As a result, Petitioner's claim based on state law is not cognizable in this proceeding.

To the extent Petitioner invokes the Constitution, he fails to raise a claim of constitutional magnitude. "Although a criminal defendant has a due process right to 'fair notice of the charges against him to permit adequate preparation of his defense,' a charging document that 'fairly but imperfectly informs the accused of the offense for which he is to be tried does not give rise to a constitutional issue cognizable in habeas proceedings.'" *Tegeler v. Renico*, 253 F. App'x 521, 526 (6th Cir. 2007) (quoting *Olsen v. McFaul*, 843 F.2d 918, 930 (6th Cir. 1988), and *Mira v. Marshall*, 806 F.2d 636, 639 (6th Cir. 1986)). Here, Petitioner was fully informed by the charging document of the offenses for which he was being tried. Petitioner therefore has no constitutional basis for quashing the information.

For all these reasons, each of which independently is sufficient, I recommend that Petitioner's first ground for habeas relief be denied.

## II.    Motion to Withdraw the Plea

Petitioner argues that the trial court violated his right to due process by denying his motion to withdraw the guilty plea. The argument is meritless.

A state defendant has no constitutionally guaranteed right to withdraw a guilty plea. *See Carwile v. Smith*, 874 F.2d 382 (6th Cir. 1989). The only constitutional challenge that a habeas court may entertain with regard to a plea of guilty is that the plea was not entered in a knowing and voluntary fashion under the standards set forth in *Boykin v. Alabama*, 395 U.S. 238 (1969). A habeas court is restricted to these federal principles, and may not grant habeas relief on the basis of state law governing the taking or withdrawal of guilty pleas. *Riggins v. McMackin*, 935 F.2d 790, 794-95 (6th Cir. 1991). Consequently, the question whether petitioner should have been allowed in the court's discretion to withdraw his guilty plea under state-court rules is not reviewable in habeas corpus.

Petitioner also argues that his plea was not voluntary. The test for determining a guilty plea's validity is "'whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant.'" *Hill*, 474 U.S. at 56 (quoting *North Carolina v. Alford*, 400 U.S. 25, 31 (1970)). Courts assessing whether a defendant's plea is valid look to "all of the relevant circumstances surrounding it," *Brady v. United States*, 397 U.S. 742, 749 (1970), and may consider such factors as whether there is evidence of factual guilt. While courts may consider whether a factual basis for a guilty plea exists in their assessments of its validity, it has generally been held that the Constitution does not require that they ensure such a basis exists. *See Alford*, 400 U.S. at 31 ("Strong evidence of guilt may suffice to sustain a conviction on an *Alford* plea, and may be essential under FED. R. CRIM. P. 11, but it is not necessary to comply with the Constitution."); *see also Matthew v. Johnson*, 201 F.3d 353, 365 (5th Cir. 2000); *Wallace v. Turner*, 695 F.2d 545, 548 (11th Cir. 1983); *Thundershield v. Solem*, 565 F.2d 1018 (8th Cir.1977); *Edwards v. Garrison*, 529 F.2d 1374, 1376 (4th Cir.1975); *Roddy v. Black*, 516 F.2d 1380, 1385 (6th Cir. 1975); *Freeman v. Page*, 443 F.2d 493, 497 (10th Cir. 1971).

In order to find a constitutionally valid guilty plea, several requirements must be met. The defendant pleading guilty must be competent, *see Brady*, 397 U.S. at 756, and must have notice of the nature of the charges against him, *see Henderson v. Morgan*, 426 U.S. 637, 645 n. 13 (1976); *Smith v. O'Grady*, 312 U.S. 329, 334 (1941). The plea must be entered "voluntarily," i.e., not be the product of "actual or threatened physical harm, or . . . mental coercion overbearing the will of the defendant" or of state-induced emotions so intense that the defendant was rendered unable to weigh rationally his options with the help of counsel. *Brady*, 397 U.S. at 750; *Machibroda v. United States*, 368 U.S. 487, 493 (1962) ("A guilty plea, if induced by promises or threats which deprive

it of the character of a voluntary act, is void."). The defendant must also understand the consequences of his plea, including the nature of the constitutional protection he is waiving. *Henderson*, 426 U.S. at 645 n. 13; *Brady*, 397 U.S. at 755; *Machibroda*, 368 U.S. at 493 ("Out of just consideration for persons accused of crime, courts are careful that a plea of guilty shall not be accepted unless made voluntarily after proper advice and with full understanding of the consequences.") (internal quotations and citation omitted). Finally, the defendant must have available the advice of competent counsel. *Tollett*, 411 U.S. at 267-68; *Brady*, 397 U.S. at 756; *McMann v. Richardson*, 397 U.S. 759, 771 & n.14 (1970). The advice of competent counsel exists as a safeguard to ensure that pleas are voluntarily and intelligently made. *Cf. Henderson*, 426 U.S. at 647 ("[I]t may be appropriate to presume that in most cases defense counsel routinely explain the nature of the offense in sufficient detail to give the accused notice of what he is being asked to admit."); *Brady*, 397 U.S. at 754 (suggesting that coercive actions on the part of the state could be dissipated by counsel).

Petitioner's plea unquestionably constituted a voluntary and intelligent choice among the alternative courses of action open to him. *Hill*, 474 U.S. at 56. As the trial court noted in denying Petitioner's request to withdraw his guilty plea, Petitioner received "what would have to be characterized in street talk as a sweet deal." (S. Tr. III, 6.) In exchange for his plea to CSC I, the government dismissed the armed robbery charge and the supplemental second-felony-offender charge. The government also promised to forego adding a charge of first-degree home invasion, which was supported by the facts and could have resulted in a substantial consecutive sentence. Further, both the government and the court agreed to sentence Petitioner within the minimum sentencing range of 108 to 180 months, whereas the calculations in the presentence report would

have resulted in a sentencing range of 225 to 375 months, more than double what was agreed to. In addition, the court had previously twice agreed to Petitioner's requests to substitute attorneys. The court had approved defense expenditures for a defense investigator, a defense expert, and independent testing of the DNA samples. All of the DNA evidence, both by the government and by the independent laboratory, identified Petitioner as the perpetrator from multiple samples from the victim's clothes, sheets and vagina. In the face of the extremely strong scientific evidence against him and the favorable terms of the plea agreement, the plea constituted a voluntary and intelligent choice among the options available to Petitioner. *Hill*, 474 U.S. at 56.

Moreover, Petitioner's claim that he was coerced to plead guilty is unavailing. Under settled Sixth Circuit authority, Petitioner's responses to the trial judge, given under oath at the plea hearing, preclude his present assertion that he was subject to coercion because he could not trust his attorney to represent him effectively. In *Baker v. United States*, 781 F.2d 85 (6th Cir. 1986), the trial court inquired concerning the terms of any plea bargain, received a response from the prosecutor on the record, and received denials from defense counsel, the prosecutor, and the defendant concerning the existence of any other terms. The Sixth Circuit held that where the trial court has scrupulously followed the required procedure, "the defendant is bound by his statements in response to that court's inquiry." 781 F.2d at 90 (quoting *Moore v. Estelle*, 526 F.2d 690, 696-97 (5th Cir. 1976)). The Sixth Circuit, noting the obvious, observed that a trial judge cannot possibly administer a plea agreement, if it consists of "secret terms known only to the parties." *Id.* at 90; *see also Warner v. United States*, 975 F.2d 1207 (6th Cir. 1992) (rejecting petitioner's claim of attorney promises that conflicted with the petitioner's plea testimony); *United States v. Todaro*, 982 F.2d 1025 (6th Cir. 1993) (reiterating that a petitioner is bound by his statements made during the plea hearing).

Here, the trial court inquired repeatedly into the voluntariness of Petitioner's plea, and Petitioner repeatedly stated that no undisclosed promises or threats had induced him to enter his guilty plea. First, prior to Petitioner's entry of his plea, the Court advised Petitioner of the rights he would be waiving, including the following:

> THE COURT: Finally, if your plea is accepted, you will be giving up any claim that the plea was the result of promises or threats that are not disclosed to the Court during today's plea proceedings or that it was not your own free choice to enter the plea. Do you understand that?
>
> THE DEFENDANT: Yes.

(Plea Tr., 18, docket #25.) After Petitioner stated his intention to plead guilty but before he admitted to facts supporting the plea, the court again inquired into the existence of other promises or threats:

> THE COURT: Has anybody promised you anything else beyond what is in that agreement to make you want to plead guilty this morning?
>
> THE DEFENDANT: No, your Honor.
>
> THE COURT: Has anybody threatened you in any way to make you want to plead guilty?
>
> THE DEFENDANT: No.
>
> THE COURT: Is it your own free choice to enter a guilty plea?
>
> THE DEFENDANT: Yes.
>
> THE COURT: And you've done this after extensive consultation with your attorney, Mr. Liquigli, as we've noted this morning. Is that correct?
>
> THE DEFENDANT: Yes, your Honor.

(Plea Tr., 20.) Finally, before accepting the plea, the court again inquired:

> THE COURT: Is anyone aware of any other promise or threat or inducement of any kind made in exchange for this plea which has not as yet been made a matter of record?

MS. KONCKI [PROSECUTOR]:  No, your Honor.

MR. LIQUIGLI [DEFENSE COUNSEL]:  None, your Honor.

(Plea Tr., 22.)  Only after these repeated inquiries and denials of any coercion did the court accept the plea and find it to be "freely, voluntarily, knowingly and intelligently proffered."  (Plea Tr., 22.) The court also determined that Petitioner had been represented by capable counsel.  (*Id.*)

Petitioner's current claim that he was coerced by his attorney flies in the face of his express and repeated denials at the plea hearing that he was coerced by anyone.  Petitioner is bound by his own statements made during the plea hearing.  The state-court's determination that Petitioner's plea was knowing, intelligent and voluntary was patently reasonable.

## **Recommended Disposition**

For the foregoing reasons, I respectfully recommend that the habeas corpus petition be denied.


Dated:   September 22, 2009                    /s/  Joseph G. Scoville                                    
                                            United States Magistrate Judge


## **NOTICE TO PARTIES**

Any objections to this Report and Recommendation must be filed and served within ten days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b).  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to file timely objections may constitute a waiver of any further right of appeal.  *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).